HOWARD W. LYON and Others, etc., Plaintiffs, *v.* CHARLES R. HOLTON and Others, etc., Defendants.

Supreme Court, Special Term, New York County, June 27, 1939.

*Bennet, House & Couts,* for the plaintiffs other than Flora E. Allen.

*Weinstein & Levinson,* for the plaintiff Flora E. Allen.

*Cravath, de Gersdorff, Swaine & Wood [Hoyt A. Moore, William D. Whitney* and *L. R. Breslin, Jr.,* of counsel], for the defendants.

SHIENTAG, J.   The motion is for summary judgment in favor of defendants in a stockholders' action based upon defenses supported by documentary evidence and claimed to be uncontroverted.

The plaintiffs, who became stockholders of the defendant corporation in 1937, contend that the facts before the court on this motion entitle them to the relief demanded in the complaint.   They urge that the defendants' motion for summary judgment should

be denied in all respects and that judgment for an accounting and an injunction should be awarded to the plaintiffs.

It is clear that if any material issue of fact is raised and not resolved by resort to the documentary evidence, summary judgment is inappropriate.

The documentary evidence is voluminous, but on analysis the issues here presented are quite clear. Defects in the pleadings of an adversary may not be availed of on a motion for summary judgment. Considering the complaint, therefore, together with the affidavits and the documentary evidence, the plaintiffs may be said to seek relief on the following grounds:

*First,* that the plan, to which reference will hereafter be made, adopted in 1930 by the defendant Bethlehem Steel Corporation, by which officers and certain key employees of the corporation agreed, under certain terms and conditions, to purchase approximately 221,000 shares of stock at the price which the shares cost the corporation, constituted a fraud by the directors upon the corporation and its stockholders, and was unlawful.

*Second,* that the acquisition of the stock by the corporation in 1929 and 1930, in order to permit the adoption and consummation of the plan, was likewise fraudulent and illegal.

*Third,* that extensions of time for payment under the plan were improper.

*Fourth,* that the proposed abandonment of this plan and the approval of the termination of the plan, given by the stockholders at the 1938 meeting, were unlawful in that (a) the stockholders were without power to ratify the proposal, and (b) the ratification was ineffective because the approval of the stockholders was obtained by fraud and was not the result of a full and honest disclosure of the facts before the meeting.

Under the plan, officers and key employees of the corporation, about 130 in number, upon the terms and conditions set forth therein, agreed, in January, 1930, to purchase approximately 221,000 shares of the company's common stock at the price which the shares cost the corporation, to wit, $91.60 a share. There was an option in the purchaser to pay up in whole or in part at any time; but the basic undertaking was to pay at the rate of fifty cents per share per month, or six dollars per year, to be deducted from the earnings of the purchaser, and subject to the qualification that, if the earnings should be substantially less than estimated normal earnings, the undertaking to pay that amount might be suspended. The purchaser was entitled to have dividends credited against the purchase price and was charged with interest at the rate of five per cent per annum on the unpaid balance of the purchase price.

There was an option in the purchaser or his estate, upon either resignation or death, to pay the purchase price and take up the shares. If this was not done within ninety days, the purchase agreement was to be deemed canceled, and the purchaser was to be repaid all amounts paid by him, with five per cent interest thereon from the respective dates of payment.

The plan, it is urged, did not, therefore, either (1) bind the purchaser to a firm commitment to pay a certain amount each year (for if his estimated normal earnings fell off, he was to be relieved from current payment), or (2) prevent the purchaser or his estate, upon termination at any time through resignation or death, from getting all of his payments refunded with five per cent interest. On December 31, 1937, the aggregate of the amounts deducted from the compensation of the participants in the plan and the amounts of other cash payments made by them was $4,004,763. This left a balance of the purchase price amounting to approximately $16,500,000.

The amended certificate of incorporation of the defendant corporation, since 1936, has provided, in substance, that the corporation might at any time, with the approval of the holders of two-thirds of its outstanding shares entitled to vote in respect thereof, agree to any changes in the purchase agreements under the plan, including any reduction in or cancellation of the obligations of the respective purchasers. (Exhibit 23, art. eleventh, p. 1.)

Pursuant to those provisions of the certificate of incorporation and with the approval of the stockholders of the corporation required thereby, the plan and the purchase agreements thereunder were changed in 1938 so as to provide for the termination of the plan on December 31, 1939. On such termination the purchasers are to release the stock to the corporation and are to have all amounts paid by them on the purchase price refunded, but without interest thereon. In other words, purchasers, as a result of the termination, reach precisely the same result that they would reach if they resigned or died, except only that they sacrifice the interest to which they or their estate would have been entitled had they resigned or died, and the corporation benefits to that extent. Such interest accrued to March 31, 1938, was $1,064,717.

The stock has fluctuated in value, but is at the present time quoted on the stock market at, roughly, sixty per cent of the purchase price. By agreeing to the changes in the plan which provided for termination at December 31, 1939, of the purchase agreements thereunder, each of the purchasers has, of course, given up any possibility of obtaining a profit from a rise in the market price

of the stock after December 31, 1939. However that may be, the fact is that the corporation is immediately confronted with a substantial loss based upon present market quotations for the stock, and what will happen after December 31, 1939, is problematical.

The important consideration, however, is that changed conditions since 1929–1930, obviously found in the intervening depression and decline of all values, with consequent decreased earnings of corporate officers and increased income taxes even on the decreased earnings, have made it impossible to carry out the plan in the manner in which it was believed that it would be carried out when it was adopted.

As the " normal earnings " of the participants " estimated " in accordance with the terms of the plan as of the time of its adoption had fallen considerably, it is urged, and with some reason, that the obligation of the purchasers to make further payments was so reduced that the plan, in effect, became unworkable. If the plan were continued, it seemed probable that most of the purchase agreements would be terminated by resignation or death, unless the market price of the stock should rise sufficiently to permit the liquidation of such agreements by the sale of the stock.

The abandonment of the plan was first proposed and strongly urged by Mr. Marshall, a non-management director, who was not a participant in the plan and who represented one of the largest individual stockholder interests. Mr. Marshall was supported by the other directors who were not subscribers, Mr. Schwab and Mr. Johnston.

Mr. Schwab wrote two letters to the stockholders, one dated March 1, 1938, and the other dated March 31, 1938. The first letter outlined the purposes of the adoption of the plan, the changes in the intervening years, the financial position to which as a consequence the plan was brought as of December 31, 1937, and the proposed change. The first letter was supplemented by the March thirty-first letter, which also went to all of the stockholders almost seven weeks before the meeting on May 19, 1938, at which the proposed change was approved by the stockholders. That letter advised the stockholders in detail as to the status of the purchase agreement of each of the fifteen officers and directors of the corporation who were participants in the plan, set forth in full the form of application for stock and agreement to purchase signed by each participant in the plan, contained a detailed analysis of the relevant paragraphs of the plan, and set forth further details as to the financial position of the plan, taking into account all of the participants. All proxies that were obtained in response to

the solicitation contained in the first letter were canceled, and only the proxies that were obtained after the second letter was received by the stockholders were voted at the May nineteenth meeting.

The change in the plan was approved at this meeting by the affirmative vote of the holders of over seventy per cent of the preferred shares and over seventy-five per cent of the common shares of the corporation. The holders of only 851 preferred shares, or less than one-tenth of one per cent of the outstanding preferred shares, and of only 4,384 common shares, or about one-seventh of one per cent of the outstanding common shares, voted against the proposal to abandon the plan.

The following propositions have been clearly established by the uncontroverted documentary evidence:

1. The acquisition of the stock by the corporation for the purpose of carrying out the plan was not fraudulent or unlawful. In any event, the most that can be said is that it constituted waste, mismanagement or negligence on the part of the directors. That being so, any cause of action based upon the alleged unlawfulness in the acquisition of this stock in 1929 and 1930 is barred by the Statute of Limitations. In such cases the six-year statute applies. (*Potter* v. *Walker*, 276 N. Y. 15, 26, 27.) There is nothing to show that the directors derived any profits from the acquisition of the stock. Even if it be inferred that the directors received some benefit from the stock acquisition, the character of the cause of action would still remain one of waste or negligence and the six-year period of limitation would apply. (*Cwerdinski* v. *Bent*, 256 App. Div. 612. See, also, *Brick* v. *Cohn-Hall-Marx Co.*, 276 N. Y. 259; *Carr* v. *Thompson*, 87 id. 160.) The running of the Statute of Limitations is not suspended because of the defendants' tenure in office as directors. (*Schmidt* v. *Merchants Despatch Transp. Co.*, 270 N. Y. 287, 301; *Erickson* v. *Macy*, 236 id. 412; *Engel* v. *Fischer*, 102 id. 400.)

2. The plan of purchase was not fraudulent or unlawful. The situation here presented is quite different from that in *Rogers* v. *Guaranty Trust Co.* (288 U. S. 123). There the dissenting opinion condemned the American Tobacco plan as unfair because the officers paid $25 a share for stock which was worth over $100 per share, whereas under the Bethlehem plan the purchasers were to pay the full cost of the shares to the corporation, to wit, $91.60 per share. In any event, the most that can be said concerning the plan is that which has already been set forth in connection with the acquisition of the stock, that is, that it was unsound, that it constituted waste, mismanagement or negligence on the part of the directors of the corporation, and that any claim based

upon the initial adoption of the plan would be barred by the six-year Statute of Limitations. (See cases cited under subd. 1 hereof.)

3. The extensions of payments under the plan were lawful and in accordance with the provisions of the plan itself.

4. The validity of the proposed abandonment depends upon two considerations: (a) Did the stockholders by a two-thirds vote have the power to ratify the termination of the plan as proposed; and (b) did they so ratify, with full knowledge of the facts and of the legal consequences?

The stockholders had the power to ratify the proposed abandonment of the plan. The abandonment was not *ultra vires*. The stockholders had the power to ratify the abandonment of what the plaintiffs themselves contended was a wasteful, unlawful plan at the outset. Such ratification would not, of course, have relieved directors from the legal consequences of their alleged wasteful acts. They would, nevertheless, remain liable until recourse against them was barred by the Statute of Limitations that was applicable.

In any event, two-thirds of the stockholders had the right to say that the plan was inherently unsound or unwise or that it subsequently turned out so to be. Assuming that purchase of stock under the plan constituted a firm commitment and that purchasers would be liable to pay for their stock regardless of the decrease in their earnings, the stockholders, with full knowledge of the facts, had the right to determine whether it was good business policy, in the light of all the circumstances, to put an end to the plan, to return the money that had been paid in under it, to accept the likelihood of loss, rather than to continue a plan that was unworkable, that might lead to troublesome litigation, or that was such a potential source of strife, discord and dissatisfaction that the affairs and management of the company would suffer in consequence.

The real question presented on this motion is whether or not the stockholders' approval of the termination of the plan was obtained through any misrepresentation or non-disclosure. In a situation of this kind the fullest disclosure of the facts was required. An examination of the letters of March 1 and March 31, 1938, clearly indicates that there was no misrepresentation, there was no concealment of any material fact, there was no untruth or half-truth presented to the stockholders. On the contrary, there was a complete disclosure of all the material facts so that the stockholders were enabled to vote intelligently on the proposal submitted to them.

Under the circumstances, therefore, I see nothing to try in this case. Any action based upon the acquisition of stock and the

adoption of the plan in 1930, even assuming those to be unlawful, would be barred by the Statute of Limitations. The proposed termination was lawful and within the power of the corporation. The documentary evidence establishes fully that the plan was abandoned by an overwhelming vote of the stockholders after a complete disclosure of the facts. Under those circumstances the defendants are entitled to summary judgment dismissing the complaint.

The motion is granted. Settle order on or before June 30, 1939.